

FILED
JUL 29 2016
Clerk, U. S. District Court
Eastern District of Tennessee

IN THE MATTER OF THE SEARCH OF )
A RESIDENCE LOCATED AT ) Case No. 2:16-MJ-144 eeneville
3811 BRACKENWOOD COURT, )
JOHNSON CITY, TENNESSEE, (SEE ) SEALED
DESCRIPTION BELOW AND )
ATTACHED PHOTOGRAPH) )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Matt Gryder, a Task Force Agent with the Federal Bureau of Investigation, Johnson City Post of Duty, your Affiant, being first duly sworn, deposes and states:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for the residence located at 3811 Brackenwood Court, Johnson City, Tennessee 37601, which is within the Eastern District of Tennessee, as described in Attachment A. This residence is occupied by Anton Garison Moton, also known as "Fish", a target of the instant investigation.

2. I am a Task Force Officer with the Federal Bureau of Investigation and have been since December 2012. I am employed by the Johnson City, Tennessee Police Department where I have been a police officer since January 1999. I have received training in the investigation of drug offenses, computer crimes, and violent crimes.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 have been committed by Moton. There is also probable cause to search the location described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## BACKGROUND

5. In the fall of 2013, in the Eastern District of Tennessee, members of the Johnson City, Tennessee Police Department ("JCPD") and the Federal Bureau of Investigation ("FBI") began a joint investigation into conspiratorial drug trafficking, firearms offenses, financial crimes, and related criminal activities. As the investigation progressed, a variety of enforcement actions were taken. In addition, numerous confidential informants were developed and utilized to conduct controlled drug and gun transactions with members of the instant crack cocaine conspiracy. One of those persons was Anton Garison Moton, also known as "Fish".

6. As part of the investigation, agents interviewed no less than six sources of information regarding Moton's suspected drug activity, including two individuals hereinafter referred to as CI-52 and CI-73. Each interviewee identified Moton as a source of supply for a far reaching crack cocaine conspiracy in the Johnson City area. The conspiracy involved numerous individuals, including couriers, intermediaries, and distributors. Moton was described as dealing in multi-ounce quantities of crack cocaine per transaction, with annual estimates exceeding kilogram quantities. Correspondingly, drug sale proceeds were approximated in the hundreds of thousands, if not millions, of dollars.

7. Importantly, the veracity of CI-52's and CI-73's information has been confirmed through independent investigation and corroboration by law enforcement. Certain portions of this information were already known, or subsequently became known, to investigators. Others

portions contained information which could have only been known by someone with direct involvement in the instant conspiracy. Likewise, CI-52 and CI-73 have demonstrated his/her reliability and credibility through the participation in controlled drug transactions with the targets of this investigation, including Moton.

## DRUG ACTIVITY

8. In late 2015, law enforcement developed a confidential informant ("CI-52") who could purchase crack cocaine from Moton. Subsequently, agents conducted two such transactions. First, on October 1, 2015, law enforcement used CI-52 to purchase approximately 43.45 grams of crack cocaine from Moton. Second, on October 26, 2015, law enforcement used CI-52 to purchase approximately 74.94 grams of crack cocaine from Moton. Laboratory analysis later conducted by the Tennessee Bureau of Investigation confirmed the drug type and quantity.

9. Then, on May 13, 2016, law enforcement met with another confidential informant ("CI-73") regarding Moton. During the meeting, CI-73 indicated that Moton was still distributing crack cocaine in Johnson City. CI-73 further relayed that another person, hereinafter referred to as "Alpha", was also currently distributing crack cocaine, and that Moton was supplying Alpha with such contraband.

10. In June 2016, investigators utilized CI-73 to arrange a controlled drug transaction with a suspected distributor for Moton, hereinafter referred to as "Bravo". After communicating with Bravo, CI-73 confirmed the purchase of three ounces of crack cocaine at a total price of $3,000. The transaction was to occur the week of June 27, 2016.

11. On June 26, 2016, agents communicated with CI-73 regarding Moton and Bravo. During the conversation, CI-73 indicated that he/she had been contacted by Bravo regarding the impending drug transaction. According to Bravo, earlier that day, one half kilogram of cocaine

hydrochloride was stolen from a residence used by Moton to conceal contraband. One half kilogram of cocaine hydrochloride was stolen. The assailants were identified as a male relative of Moton, and a female companion. Thereafter, Moton located the female companion and kidnapped her for purposes of questioning. Once satisfied with her lack of direct involvement, and having confirmed that his male relative was the true culprit, Moton released the female companion. As part of their conversation, Bravo told CI-73 that he had informed Moton of their impending drug transaction. Since Bravo was to obtain the contraband from Moton, Bravo informed Moton that he now owed CI-73 that amount of crack cocaine. Moton then expressed his understanding and accepted responsibility for the transaction.

12. Later on June 26, 2016, Moton communicated with CI-73 via an unrecorded voice call. Electronic analysis confirmed the occurrence of the call, and the duration of six minutes, twenty-seven seconds. In the ensuing conversation, Moton discussed the theft, indicated his understanding of the arranged drug transaction between CI-73 and Bravo, and stated that he would "make it right". CI-73 interpreted this to mean that Moton himself would consummate, or coordinate, the drug transaction. Moton then asked CI-73 to refrain from retaliating against the perpetrator of the theft, stating that he would handle the matter.

## PROBABLE CAUSE FOR THE RESIDENCE

13. As part of the investigation, agents subpoenaed utility and property records for 3811 Brackenwood Court, Johnson City, Tennessee 37601. Based upon surveillance, this address was believed to be occupied by Moton. Upon receipt, those records revealed the use of nominee names for such services. Those names included a known area drug addict with no financial resources to speak of. Based upon training and experience, this tactic is commonly employed by

drug dealers to conceal their association with residences wherein they store drugs, drug sale proceeds, firearms, and other materials related to their illegal conduct.

14. On July 29, 2016, investigators located Moton at 3811 Brackenwood Court, Johnson City, Tennessee 37601. Moton eventually departed the residence, drove approximately one quarter of a mile away from the residence, and parked his vehicle. Moton then exited his car, proceeded on foot back to his residence, and entered the structure. After several minutes, Moton exited the home carrying two large, tote bags. Moton then re-entered his vehicle with the bags, and departed the area. Agents followed Moton from the site for a period of time. Within minutes, Moton observed the presence of law enforcement and began to flee at a high rate of speed. Investigators lost contact with Moton, but ultimately located him on an area roadway. Upon approach, Moton surrender to investigators and was detained.

15. Subsequently, Moton was Mirandized and consented to questioning. Upon doing so, Moton admitted to residing at 3811 Brackenwood Court, Johnson City, Tennessee 37601. Moreover, Moton admitted his involvement in the instant crack cocaine conspiracy, and to personally distributing crack cocaine.

## CONCLUSION

16. Based upon all the foregoing, and upon training and experience, your Affiant believes there is probable cause to search the location described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

17. Based upon your affiant's training, experience, and participation in investigations involving the distribution/sale of controlled substances, more specifically, cocaine base, your affiant knows that:

a. .Drug traffickers maintain books, records, receipts, note ledgers, airline tickets, money orders and other papers relating to the transportation, ordering, selling, and distribution of controlled substances and chemicals. Traffickers commonly (front) provide narcotics/controlled substances on consignment to their clients. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where these traffickers have ready access to them.

b. It is common for drug traffickers to maintain books, receipts, note ledgers, travel records, and receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances and/or chemicals. That the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them.

c. It is common for drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in a secure location within their residences, businesses, and/or other locations which they maintain dominion and control over for ready access and to conceal these items from law enforcement.

d. In order to accomplish this concealment, drug traffickers frequently build "stash" places within their residences and businesses; there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found at residences of drug traffickers.

e. It is common for persons involved in large scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or

expenditure of drug proceeds such as currency, financial instruments, precious metals, gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, pass books, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safety deposit keys and money wrappers. These items are maintained by the traffickers within their residences, businesses, or other locations which they maintain dominion and control over.

f. Drug traffickers often utilize electronic equipment such as computers, facsimile machines, currency counting machines and telephone answering machines to generate transfers, count money, maintain records and/or store the information described in items a, c, d, and e above.

g. When drug traffickers amass large proceeds from the sale of drugs the traffickers attempt to legitimize these profits through money laundering activities, to accomplish these goals drug traffickers utilize, including but not limited to domestic and international banks and their attendant services, security brokers, professionals such as attorneys and accountants, casinos, real estate, "shell" corporations and business fronts and/or otherwise legitimate businesses which generate large quantities of currency.

h. The sale of controlled substances in particular cocaine base generates large quantities of U.S. currency in small denominations (commonly referred to as "street money").

i. It is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber band stacks in varying increments to facilitate quick counting.

j. The courts have recognized that the small and medium denominations of questionable currency along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

k. Drug traffickers commonly maintain address and telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization.

l. Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product; that these traffickers usually maintain these photographs in their possession.

m. The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in a controlled substance.

n. Drug traffickers commonly have in their possession, that is on their person, at their residence and/or their businesses; firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect or secure drug traffickers property, such property may include but is not limited to narcotics/drugs, jewelry, narcotic/drug paraphernalia, books, records and U.S. currency.

o. Drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies.

p. Drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies.

q. Even though these assets are in other person's names the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

r. Drug traffickers must maintain on hand large amounts of U.S. currency in order to maintain and finance their illegal on-going drug businesses

s. The United States Court of Appeals for the Sixth Circuit has held that evidence of drug sales, such as books, records, letters of credit, and electronic media, are likely to be found where drug traffickers live. United States v. Mendizabel, 214 Fed. Appx. 496, 499-500 (6th Cir. Dec. 20, 2006)( citing United States v. Jones, 159 F.3d 969, 975 (6th Cir.1998)). See also United States v. Merrell, 2009 WL 1505262 (6th Cir. May 28, 2009); United States v. Anderson, 2009 WL 1474721 (6th Cir. May 26, 2009); United States v. Gunter, 551 F.3d 472, 481 (6th Cir. 2009). In United States v. Goward, 188 Fed Appx. 355 (6th Cir. Jul. 13, 2006), the court held that a search warrant affidavit containing credible, verified allegations of drug trafficking, verification that defendant lived at the residence, combined with the affiant-officer's experience that drug dealers keep evidence of dealing at their residence, even in the absence of any indication of any wrongdoing occurring at that residence, established probable cause for the issuance of a warrant to

search defendant's residence. The court stated that "[w]e are inclined to . . . side with our sister Circuits in believing that it is a reasonable inference that "in the case of drug dealers, evidence is likely to be found where the dealers reside." Id. at 359 (citing United States v. Frazier, 423 F.3d 526, 537 (6th Cir.2005); and United States v. Miggins, 302 F.3d 384, 394 (6th Cir.2002) (citing cases from the First, Second, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits supporting the proposition that evidence of drug trafficking is likely to be found in the residence of the drug dealer)).

Respectfully submitted, this Friday, July 29, 2016.

Matthew S. Gryder
Task Force Officer
Federal Bureau of Investigation


Subscribed and sworn to before me on this Friday, July 29, 2016.

CLIFTON L. CORKER, UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the residence located at 3811 Brackenwood Court, Johnson City, Tennessee 37601, which is within the Eastern District of Tennessee. (See attached photographs).







ATTACHMENT B

Particular Things to be seized

1. Any items pertaining to the illegal possession with the intent to distribute crack cocaine, (hereinafter referred to as crack), including documents such as telephone records indicating telephone communications to coconspirators, drug customers and drug suppliers; express or overnight mail receipts, money, books, records, receipts, schedules, tickets, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances; address books, telephone books, computerized records and papers reflecting names, addresses and telephone numbers of drug customers and suppliers used to facilitate the distribution of controlled substances; books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks, receipts, passbooks, bank checks, and deposit bank records, all of which evidence the obtaining, transferring, and concealment of the proceeds of and assets associated with drug trafficking; United States currency, precious metals, and financial instruments, including, but not limited to stocks and bonds, and vehicle title documents which constitute the proceeds of drug trafficking and which constitute the operating capital for continued drug trafficking; photographs of drug customers and suppliers and other coconspirators in the drug trafficking trade; photographs of assets acquired from the sale of controlled substances associated with the drug trafficking trade; all of which constitutes evidence of the commission of the above criminal offenses, and that are currently being used by Anton Garison Moton, also known as "Fish", in violation of 21 U.S.C. §§ 846 and 841(a)(1), 841(b)(1)(A).